No. 25-40117

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

MICHAEL KEVIN ADAMS,
*Petitioner-Appellant*

v.

ERIC GUERRERO, Director,
Texas Department of Criminal Justice,
Correctional Institutions Division
*Respondent-Appellee*

## PETITIONER-APPELLANT'S BRIEF

Appeal from the United States District Court for
the Eastern District of Texas, Sherman Division,
No. 4:21-CV-207-SDJ

BRETT ORDIWAY
Texas Bar No. 24079086
brett@ordiway.com

ROBERT N. UDASHEN
Texas Bar No. 20369600
robert@ordiway.com

ORDIWAY PLLC
8350 N. Central Expressway
Suite 1900
Dallas, Texas 75206
(469) 205-1600

*Counsel for Petitioner-Appellant*

## CERTIFICATE OF INTERESTED PERSONS

In Case No. 25-40117, Michael Kevin Adams, Petitioner-Appellant, v. Eric Guerrero, Director, TDCJ, CID, Respondent-Appellee, the undersigned counsel of record certifies that the following listed persons have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

1. Counsel for Petitioner-Appellant:

   Brett Ordiway
   Robert Udashen

2. Counsel for Respondent-Appellee:

   Ken Paxton, Attorney General of Texas
   Cara Hanna, Assistant Attorney General

3. District Court Judge:

   The Honorable Sean D. Jordan

Respectfully submitted,

/s/ Brett Ordiway
BRETT ORDIWAY

*Counsel for Petitioner-Appellant*

2

## STATEMENT REGARDING ORAL ARGUMENT

This is the rare capital-murder case in which a dissenting justice on a Texas appellate court has already concluded that the evidence is legally insufficient to support the conviction. Because this issue is, by its nature, fact-intensive, the opportunity to ask counsel questions about the extensive record is likely to help this Court resolve this issue, and Petitioner-Appellant Michael Kevin Adams requests oral argument.

## TABLE OF CONTENTS

Certificate of Interested Persons................................................................2

Statement Regarding Oral Argument.........................................................3

Table of Authorities ....................................................................................6

Jurisdictional Statement..............................................................................8

Issue Presented for Review .........................................................................8

    Whether Texas's Fifth Court of Appeals unreasonably applied clearly established federal law in holding that the evidence is legally sufficient to support Adams's conviction.................................................................8

Statement of the Case ..................................................................................8

    1.    Adams's obvious motive was all that the police and the jury needed..........8

    2.    On appeal, one justice recognized that the evidence is legally insufficient to support Adams's conviction. .........................................................11

    3.    The trial court and the Texas Court of Criminal Appeals concluded that Adams's trial attorneys effectively assisted him................................. 12

    4.    The federal district court concluded that Adams did not overcome AEDPA's relitigation bar and could not relitigate his Fourth Amendment claim. ………................................................................... 13

Summary of the Argument......................................................................... 14

Standard of Review .................................................................................... 16

Argument .................................................................................................... 17

1.   The evidence is legally insufficient to support Adams's conviction, and in concluding otherwise, Texas's Fifth Court of Appeals unreasonably applied clearly established federal law. .......................................................................... 17

   a.   A rational juror could have, at most, a strong suspicion that Adams was the murderer. ....................................................................................... 17

   b.   Reasonable jurists would disagree with the district court's contrary conclusion. .................................................................................... 25

Conclusion .................................................................................................. 29

Certificate of Service ................................................................................... 30

Certificate of Compliance with Type-Volume Limit, ............................................ 30

Typeface Requirements, and Type-Style Requirements ......................................... 30

## TABLE OF AUTHORITIES

**Cases**

*Adams v. State*, No. 05-16-01361-CR, 2018 WL 2355280 (Tex. App. Dallas May 24, 2018, pet. ref'd) .......... 8, 9, 10, 11, 12, 15, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28

*Adams v. State*, PD-0637-18 (Tex. Crim. App. 2018) ............................................... 12

*Adams v. Texas*, 139 S. Ct. 1384 (2019) ..................................................................... 12

*Ballard v. State*, 923 So.2d 475 (Fla. 2006) ............................................................. 22

*Coleman v. Johnson*, 566 U.S. 650 (2012) .................................................................. 18

*Ex parte Adams*, WR-91,693-01 (Tex. Crim. App. Feb. 24, 2021) ..................... 12, 13

*Griffin v. State*, 614 S.W.2d 155 (Tex. Crim. App. 1981) ......................................... 18

*Jackson v. Virginia*, 443 U.S. 307 (1979) ............................................................ 18, 29

*Neal v. Vannoy*, 78 F.4th 775 (5th Cir. 2023) ............................................................ 16

*O'Laughlin v. O'Brien*, 568 F.3d 287 (1st Cir. 2009) ............................................... 29

*Rayner v. Superintendent Forest SCI*, No. 21-3230, 2023 WL 1433610 (3d Cir. Feb. 1, 2023) ............................................................................................................ 21, 24, 29

*Reed v. State*, 541 S.W.3d 759 (Tex. Crim. App. 2017) ............................................ 21

*State v. Glass*, 279 A.3d 203 (Conn. App. Ct. 2022) ................................................ 21

*Stone v. Powell*, 428 U.S. 465 (1976) ........................................................................ 14

*Tanner v. Yukins*, 867 F.3d 661 (6th Cir. 2017) ........................................................ 29

*Temple v. State*, 390 S.W.3d 341 (Tex. Crim. App. 2013) ......................................... 10

*United States v. Crane*, 781 F. App'x 331 (5th Cir. 2019) ........................................ 25

*Williams v. Taylor*, 529 U.S. 362 (2000) ................................................................... 17

**Statutes**

28 U.S.C. § 2253 ........................................................................................................... 8

28 U.S.C. § 2254.................................................................. 16, 18, 25, 29

Tex. Penal Code § 12.31....................................................................11

Tex. Penal Code § 19.03 ................................................................ 10

**Rules**

Fed. R. App. P. 22................................................................................8

Tex. R. Evid. 403 ............................................................................. 14

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 2253(c)(1)(A) to review the district court's final order in this habeas proceeding. ROA.231; *see also* Fed. R. App. P. 22(b)(2).

## ISSUE PRESENTED FOR REVIEW

Whether Texas's Fifth Court of Appeals unreasonably applied clearly established federal law in holding that the evidence is legally sufficient to support Adams's conviction.

## STATEMENT OF THE CASE

### 1. Adams's obvious motive was all that the police and the jury needed.

After being introduced by a mutual friend, Nicole Leger and Adams began dating, moved in together, and got engaged to be married. *Adams v. State*, No. 05-16-01361-CR, 2018 WL 2355280, at *2 (Tex. App. Dallas May 24, 2018, pet. ref'd). Their relationship dramatically deteriorated, culminating in allegations in March 2013 that Adams kidnapped and sexually assaulted Leger. *Id.* at *2-3.

When Leger was found shot to death six months later in her Melissa home, the police immediately focused on Adams. Though Leger was routinely in contact with strange men in her job as an exotic dancer, she met other men off Craigslist

(ROA.12667), and forensic evidence indicated that between one and three unidentified men had sex with Leger in her bedroom shortly before her death,[1] Adams had an obvious motive in preventing Leger from testifying that he kidnapped and sexually assaulted her. *Adams,* 2018 WL 2355280, at *5. And though cell records show that his phone was only in Frisco on the day of Leger's murder (ROA.14929), Adams's whereabouts could not be confirmed until 10:45 a.m. *Id.* Because Leger's son said she was alive when he left for school around 8:00 a.m., the police's theory came to be that between one and three unidentified men had consensual sex with Leger in her home, and then Adams entered and murdered her, all between 8:00 and 10:45 a.m. *Id.* at *4. The police dismissed a neighbor's statement that he heard two loud "booms" that afternoon, when security footage shows Adams at Home Depot. *Id.* at *6, 9. And the police dismissed that a witness saw a truck in front of Leger's home matching one driven by disgraced former Frisco Police Detective Scott Greer, who resigned after engaging in sexual

---

[1] During a postmortem sexual-assault examination, spermatozoa and male DNA profiles were microscopically detected on vaginal and anal smear slides. ROA.4805-06, 14899, 14924. On Leger's body's exterior, a field agent observed a "clearish-type substance" on the inner left thigh that visually resembled semen. ROA.5129. Subsequent laboratory testing of the swab collected from this external area returned a presumptive negative result for semen, but DNA profiling confirmed the presence of a mixture containing an unknown male contributor. ROA.14918, 14925. Swabs taken from Leger's right thigh and left breast also tested presumptively negative for semen yet yielded DNA profiles belonging to a single, unknown male individual. ROA.14918-19, 14925. Adams was excluded as a possible contributor to all the identified DNA profiles.

relationships with victims and witnesses in multiple cases, including with Leger while investigating her kidnapping and sexual assault allegations. *Id.* at *3. A person in the driver's seat of the truck "appeared to be trying to recline or slink down" to "keep from being seen in the truck." *Id.* at *3, 8, 15.

In May of 2014, the State of Texas filed an indictment alleging Adams committed capital murder by intentionally causing Leger's death while "in the course of committing or attempting to commit the offense of retaliation" against her. *Id.* at *1; *see* Tex. Penal Code § 19.03(a)(2). The State notified Adams that it did not intend to seek the death penalty. Adams pleaded not guilty and, in advance of his jury trial, moved the trial court to suppress evidence obtained during the police's warrantless inventory search of his truck—most notably, an ordinary machine screw that a Texas Ranger nonetheless believed came from a gun grip. ROA.3061. The trial court denied Adams's motion. ROA.11805.

Because of the other suspects—any one of whom could have murdered Leger, the lead investigator conceded (ROA.13114-15)—and the short timeframe in which Adams did not have an alibi, the State at trial relied heavily on evidence that Adams had a motive. Indeed, much of the trial was devoted to the alleged sexual assault. And Leger's father testified that Leger told him Adams threatened to kill her if she testified against him. *Adams*, 2018 WL 2355280, at *8. The State also

relied heavily on the screw and a lone instance of Adams's touch DNA identified on another man's used condom in Leger's trash can. *See id.* at *21 (Whitehill, J., dissenting) (explaining that the touch DNA became "[t]he evidence the State primarily relie[d] on to place [Adams] at the crime scene when the shooting occurred").

The defense presented evidence that Adams's touch DNA could have gotten on the condom through transference or contamination. As to the former, Adams used to live with Leger, and as to the latter, one technician, on one day, at one workstation, forensically tested evidence from the alleged sexual assault and murder cases. *Id.* at *7; *id.* at *21 (Whitehill, J., dissenting). The jury nonetheless found the evidence proved Adams murdered Leger beyond a reasonable doubt. As required by law, the trial court then sentenced Adams to life imprisonment without the possibility of parole. *Id.* at *1; *see* Tex. Penal Code § 12.31.

### 2. On appeal, one justice recognized that the evidence is legally insufficient to support Adams's conviction.

Before Texas's Fifth Court of Appeals, Adams pleaded that, while motive and opportunity certainly are "circumstances indicative of guilt," they are not sufficient to prove guilt. *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). And the State's only other evidence—the lone instance of Adams's touch DNA and the screw found in Adams's truck—doesn't make up the difference.

11

Adams further argued that the trial court abused its discretion by denying his motion to suppress the results of the inventory search of his truck. *Adams*, 2018 WL 2355280 at *1. Over the dissent of one justice, who recognized that Adams was convicted based upon speculation, not evidence, the court overruled both grounds and affirmed the trial court's judgment. *Id.*

Adams petitioned the Texas Court of Criminal Appeals to exercise its discretionary review, persisting in both grounds. *See Adams v. State*, PD-0637-18 (Tex. Crim. App. 2018). The Court of Criminal Appeals refused the petition. *Id.* Adams then petitioned the United States Supreme Court for a writ of certiorari, persisting in the illegal-search ground. The Court denied the petition. *Adams v. Texas*, 139 S. Ct. 1384 (2019).

3. **The trial court and the Texas Court of Criminal Appeals concluded that Adams's trial attorneys effectively assisted him.**

In an application for a writ of habeas corpus filed in the trial court under Article 11.07 of the Texas Code of Criminal Procedure, Adams alleged in two grounds that he was denied his constitutional right to effective assistance from counsel. *Ex parte Adams*, WR-91,693-01 (Tex. Crim. App. Feb. 24, 2021). First, trial counsel provided ineffective assistance in failing to object to the admission of the touch DNA evidence. Second, trial counsel provided ineffective assistance by making the wrong objection to the State's improper closing argument. In a third

ground, Adams explained that even if counsel's individual instances of deficient performance were not prejudicial, they were together.

In a responsive affidavit, Adams's lead trial attorney claimed that any failure to object during trial was strategic. The trial court then found and concluded that neither of counsel's failures were unreasonable or reasonably likely to have affected the outcome of trial, and the Court of Criminal Appeals denied Adams's application without written order. *Ex parte Adams*, WR-91,693-01.

**4. The federal district court concluded that Adams did not overcome AEDPA's relitigation bar and could not relitigate his Fourth Amendment claim.**

Adams petitioned the United States District Court for the Eastern District of Texas under 28 U.S.C. § 2254, persisting in his claims that (1) the evidence presented at his trial was legally insufficient to support his conviction; (2) in failing to object under Texas Rule of Evidence 403 to the admission of "touch DNA" evidence, his trial counsel provided ineffective assistance; and (3) the police's warrantless impoundment of his truck was unreasonable. ROA.11-12.

The magistrate judge to whom the court assigned the matter concluded that Adams was not entitled to relief. ROA.161, 202-05. On the first ground, the magistrate judge reasoned that Adams "simply . . . disagree[d] with the jury's resolution of alleged conflicts in the evidence" and that "the evidence at [his] trial

was not nearly sparse enough" to be insufficient. ROA.188-89. On the second ground, the magistrate judge concluded that "the 'touch DNA' evidence was probative because it connected [Adams] to the victim's house" and was not unfairly prejudicial because it was "accompanied by other evidence from which the jury could evaluate [its] meaning." ROA.200; *see* Tex. R. Evid. 403. On the third ground, the magistrate judge observed that in *Stone v. Powell*, 428 U.S. 465 (1976), the Supreme Court held that federal habeas proceedings are no place for state prisoners to relitigate Fourth Amendment issues. ROA.201-02; *see Stone*, 428 U.S. at 494.

Adams specifically objected (ROA.210), but on February 26, 2025, the district court adopted the magistrate judge's findings and conclusions, denied Adams's petition, dismissed the case with prejudice, and denied a certificate of appealability. ROA.231. Adams then moved this Court for a certificate of appealability on all three grounds. On October 10, 2025, this Court granted a certificate of appealability as to Adams's sufficiency claim only.

## Summary of the Argument

As the dissenting justice in the Fifth Court of Appeals explained, the court unreasonably applied *Jackson v. Virginia*, 443 U.S. 307 (1979), in holding that the evidence is legally sufficient to support Adams's conviction. *Adams*, 2018 WL

2355280, at *17 (Whitehill, J., dissenting). Concluding otherwise, the district court reasoned that the "the evidence presented at trial shows much more" than what Adams claimed. ROA.226. But it doesn't. For example, the evidence does not show that "the killing occurred" in "the morning of September 9, 2013," when "Adams did not have an alibi." ROA.226. The record supports only that Leger was murdered "sometime between 8 a.m. and 4:30 p.m." *Adams*, 2018 WL 2355280, at *15. Because Adams had an alibi after 10:45 a.m., it was merely the police's theory that between one and three unidentified men had sex with Leger in her home, and then Adams entered and murdered her, all between 8:00 and 10:45 a.m. *Id.* at *4. Likewise, little can be inferred from evidence suggesting that Adams once owned two .22 caliber firearms that were not recovered after Leger's murder. Adams was a gun collector and firearms dealer. ROA.12222. The State's own firearms expert testified that the groove patterns on the .22 bullets recovered at the crime scene matched the groove pattern for at least seventeen other gun manufacturers' groove patterns. *Id.* at *10. And the police confiscated Adams's firearms when a judge entered a protective order following the sexual assault and kidnapping allegations. ROA.12275-77.

The evidence shows only that (1) Adams had a motive; (2) he had a small window of opportunity; (3) the police found an ordinary machine screw in his truck

that could have come from anything, including a gun grip; and (4) a single instance of his touch DNA was identified on a condom in Leger's bathroom trash can. ROA.12977. Because the DNA evidence is essentially meaningless—Adams lived with Leger when they were engaged to be married, and touch DNA can linger for a long time (ROA.12448, 13083, 13167)—the evidence is legally insufficient to support the jury's verdict.

## STANDARD OF REVIEW

"In a habeas corpus appeal, [this Court] review[s] the district court's findings of fact for clear error and its conclusions of law de novo, applying the same standards to the state court's decision as did the district court." *Neal v. Vannoy*, 78 F.4th 775, 782 (5th Cir. 2023). As in most cases evaluating state prisoners' constitutional claims, the district court here considered Adams's sufficiency claim under the Antiterrorism and Effective Death Penalty Act. Under AEDPA, federal courts may not grant habeas relief on a claim adjudicated on the merits in state court unless the adjudication resulted in a decision that was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Clearly established federal law comprises "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision is "contrary to" clearly established federal law when it "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.* at 413. A state court decision is an "unreasonable application of" clearly established federal law if it "identifies the correct governing legal rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case," or if it "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407.

### ARGUMENT

1. **The evidence is legally insufficient to support Adams's conviction, and in concluding otherwise, Texas's Fifth Court of Appeals unreasonably applied clearly established federal law.**

   a. **A rational juror could have, at most, a strong suspicion that Adams was the murderer.**

In *Jackson v. Virginia*, 443 U.S. 307 (1979), the Supreme Court "announced . . . the constitutional minimum required to enforce the due process right" to be free from conviction except on proof beyond a reasonable doubt. *Id*. at 319 n. 12. "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis in original).

"Although *Jackson* was setting a standard for review of state convictions by federal courts"—like Adams, Jackson was a state prisoner petitioning for a federal writ of habeas corpus—the Texas Court of Criminal Appeals adopted *Jackson* for direct-appeal review of insufficient-evidence claims. *See Griffin v. State*, 614 S.W.2d 155, 159 (Tex. Crim. App. 1981). In holding that the evidence is legally sufficient to support Adams's conviction, Texas's Fifth Court of Appeals thus correctly identified the relevant question. *See Adams*, 2018 WL 2355280, at *15. But the court unreasonably applied *Jackson. See* 28 U.S.C. § 2254(d)(1); *Coleman v. Johnson*, 566 U.S. 650 (2012) (explaining that "the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law").

In its majority opinion, the court identified fifteen pieces of evidence and announced that, "[o]n this record, considering all of the evidence in the light most

favorable to the verdict, we conclude that, based on that evidence and reasonable inferences therefrom, a rational jury could have found the essential elements of the crime beyond a reasonable doubt." *Adams*, 2018 WL 2355280, at *15. As Adams explained in his petition for discretionary review, however, the vast majority of the pieces are innocuous. The last piece, for example, is that "no other DNA of appellant was found at the scene." *Id.* And as explained by the dissenting opinion, it means little that an old photo in Adams's closet showed .22 handguns in a case, but after the murder, the guns were gone (items 12 and 13). Adams was a gun collector and licensed federal firearms dealer. ROA.12222, 12540. That's what gun collectors and firearms dealers do: they buy and sell guns. Moreover, the State's own firearms expert testified that the groove patterns on the .22 bullets recovered at the crime scene matched the groove pattern for at least seventeen other gun manufacturers' groove patterns. *Id.* at *10. And the police confiscated Adams's firearms when a judge entered a protective order following the sexual assault and kidnapping allegations. ROA.12275-77. Out of the fifteen pieces of evidence, all that's really there is what Adams stipulated to: (1) he had a motive; (2) he had a small window of opportunity; (3) the police found an ordinary machine screw in his truck that could have come from anything, including a gun grip; and (4) a lone

instance of his touch DNA was identified on a condom in Leger's bathroom trash can. ROA.12977.

As well-explained by the dissenting opinion, that doesn't add up to sufficient evidence. First, while Texas Ranger Reuben Mankin testified that the screw was consistent with that from a gun grip, he couldn't say for sure, and he didn't know if any officer had ever attempted to fit it into a firearm. *See* Ground Three, infra; ROA.12521-22, 12652-53. Ranger Mankin only speculated, then, and could not formulate any real conclusion as to the screw. The State's actual firearms expert testified, however (albeit outside the presence of the jury), that the screw could have come from anything: "It's just a machine screw." ROA.12977. "It would be misleading to . . . try to tell [a jury] that this screw came out of a handgrip to a gun." ROA.12977.

The vaunted DNA evidence is equally meaningless. Swabs from Leger's vagina, anus, thighs, left breast, and a yellow condom found in her en suite bathroom each contained DNA interpreted as a mixture of Leger's and an unknown male's, and not necessarily the same male's. *Adams*, 2018 WL 2355280, at *6; ROA.14918-19, 14925. The outward-facing surface of a green condom found in Leger's en suite bathroom's trash can contained DNA interpreted as a mixture of Leger's and either two or three other individuals. *Id.* And the inward-facing

surface of the green condom contained DNA interpreted as a mixture of Leger's
and two males. *Id.*

Adams was definitively excluded as a contributor to all but one of the
samples. ROA.12698-700. In the DNA mixture found on the outward-facing
surface of the green condom, Department of Public Safety analysts identified
epithelial cells—colloquially known as "touch DNA"—that "[came] back to"
Adams. *Id.* Even "[t]he State's DNA witness" testified that "finding a person's
DNA at a location proves only that his DNA was there"—not that he was there, or
"how or when the DNA got there." *Adams*, 2018 WL 2355280, at *21 (Whitehill,
J., dissenting); *see also Reed v. State*, 541 S.W.3d 759, 777 (Tex. Crim. App. 2017)
("And as with all DNA testing generally, touch DNA analysis cannot determine
when an epithelial cell was deposited. So in addition to being unable to definitively
show who left the epithelial cell, it is unable to show when it was deposited.");
*Rayner v. Superintendent Forest SCI*, No. 21-3230, 2023 WL 1433610, at *2 (3d Cir.
Feb. 1, 2023) ("While the prosecution infers from this evidence that Rayner
participated in the crime with his half-brother, there was no way to determine when
Rayner's DNA had been deposited on the shirt. The DNA could have been left on
the t-shirt—an easily movable object—at any time."); *State v. Glass*, 279 A.3d 203,
215 (Conn. App. Ct. 2022) (concluding that touch DNA evidence was insufficient

to establish guilt absent evidence that it was placed on object by primary and not secondary transfer); *Ballard v. State*, 923 So.2d 475 (Fla. 2006) (holding that evidence was legally insufficient to support capital-murder conviction where hair and fingerprint evidence comprised the entire circumstantial case against the defendant). And "the amount of DNA on this condom [was] actually very low for the male contributor." ROA.5105. But though other DNA samples taken from Leger's home "placed at least two unknown persons' DNA at the crime scene," and all told, it's "possible that DNA from more than a *dozen* possible shooters was found at the crime scene," *Adams*, 2018 WL 2355280, at *22 (Whitehill, J., dissenting) (emphasis added), the State nonetheless emphasized in closing that "Adams is the only man whose DNA is found at the crime scene." ROA.13237.

Keeping in mind that the State introduced evidence that Adams suffered from obsessive-compulsive disorder and was "incredibly neat and orderly" (ROA.12449, 12524), it's far more likely that his touch DNA landed on another man's used condom not because he murdered Leger, but by transference or contamination. Adams lived with Leger when they were engaged to be married, and touch DNA can linger for a long time. ROA.12448, 13083, 13167. It could have lingered in the trash, or it could have lingered on Leger's bedsheets, transferring to the condom there. ROA.13138, 13167. The police's lead investigator confirmed as

much (ROA.13083), and indeed, Leger's son could not be excluded as a contributor to DNA on the outside of the condom. ROA.12884. As the dissent recognized, this "illustrate[s] how DNA can be transferred from one source or location to another source or location." *Adams*, 2018 WL 2355280, at *21 (Whitehill, J., dissenting). Moreover, nothing else puts Adams anywhere near Leger's Melissa home that day. To the contrary, cell records show that his phone was only in Frisco. ROA.14929. And the police did not find his fingerprints at the scene.

Holding that the evidence was sufficient in Adams's case, however, the majority opinion "note[d]" that (1) "the record . . . is silent as to when [Leger] and appellant lived together and as to what belongings she retained after moving out of his home"; (2) Leger "lived in at least one other location in Frisco between the time she lived with appellant and the time she moved to the house in Melissa"; (3) "DNA evidence can 'decrease with washing'"; (4) "the green condom containing appellant's touch DNA was found atop 'fresh trash' in a trash can with a plastic liner"; and (5) "although multiple items from the crime scene were tested, no other DNA of appellant was found at the scene." *Adams*, 2018 WL 2355280, at *15. But none of that changes what makes the single instance of touch DNA incapable of supporting an inference of guilt: (1) finding a person's DNA proves only that his DNA was where you found it, not that he was there; (2) DNA can linger

indefinitely; and (3) it's possible that DNA from more than a dozen possible murderers was found at the crime scene. Moreover, the court of appeals ignored that the touch DNA sample may have been contaminated. Because the same forensic scientist examined evidence from Leger's murder and sexual assault at the same time at the same workstation,[2] multiple State witnesses from the Department of Public Safety Crime Lab conceded that contamination was possible and that they wouldn't know if it occurred. ROA.12766-67, 12815-16, 12835, 12841, 12845, 13134-36, 13155-56, 13172. The dissent thus got it right: "the DNA evidence in this case is speculative at best" and "thus legally insufficient to prove beyond a reasonable doubt that" Adams murdered Leger. *Adams*, 2018 WL 2355280, at *22 (Whitehill, J., dissenting); *see also Rayner*, 2023 WL 1433610, at *2 ("Without evidence establishing when Rayner's DNA was left on the t-shirt or sufficient additional incriminating evidence, circumstantial or otherwise connecting Rayner to the scene of the crime, no rational juror could have found him guilty beyond a reasonable doubt.").

It may be "easy to see how the jury convicted [Adams] on this record in this emotionally charged case." *Adams*, 2018 WL 2355280, at *18 (Whitehill, J.,

---

[2] This wasn't the lab's only blunder: swabs of blood-like substances found on a light switch in Leger's bedroom and in her toilet were lost. ROA.12650-51.

dissenting). But where the "DNA evidence that the State urge[d] puts [Adams] at the crime scene also puts at least two and possibly more than a dozen other people there[,] and there is no evidence of who actually committed the crime," a rational juror could have, at best, a strong suspicion that Adams was the murderer. *Id.* at *17 (Whitehill, J., dissenting). "A conviction may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuate piling of inference on inference." *United States v. Crane*, 781 F. App'x 331, 332-33 (5th Cir. 2019) (internal quotations omitted). The evidence is legally insufficient to support Adams's capital murder conviction, and in determining otherwise, Texas's Fifth Court of Appeals unreasonably applied *Jackson*. *See* 28 U.S.C. § 2254(d)(1).

### b. Reasonable jurists would disagree with the district court's contrary conclusion.

Concluding otherwise, the magistrate judge to whom the district court assigned Adams's petition misunderstood Adams to challenge the jury's "resolution of alleged conflicts in the evidence" and circumstantial evidence, generally. ROA.188-89. But Adams argued that the evidence presented at *his* trial "doesn't add up to sufficient evidence." ROA.33. And it doesn't. A single instance of touch DNA, plus a machine screw, motive, and a small window of opportunity, does not prove beyond a reasonable doubt that Adams murder Leger, and that's especially so where cell records show that his phone was in Frisco (ROA.14929);

the police did not find his fingerprints at the scene or identify a murder weapon; other DNA samples taken from Leger's home "placed at least two unknown persons' DNA at the crime scene," and all told, it's "possible that DNA from more than a *dozen* possible shooters was found at the crime scene," *Adams*, 2018 WL 2355280, at *22 (Whitehill, J., dissenting) (emphasis added); the police found unidentified fingerprints in the victim's kitchen (ROA.4334); and the victim's neighbor heard two loud "booms" at a time when security footage shows Adams at Home Depot. *Id.* at *9.

Panning Adams's "groundless" objections and adopting the magistrate judge's report, the district court reasoned that "the evidence presented at trial shows much more" than Adams claimed. ROA.226. The district court emphasized:

1) that "Adams did not have an alibi for the morning of September 9, 2013, when the killing occurred";

2) evidence suggesting that Adams once owned two .22 caliber firearms that were not recovered after Leger's murder;

3) evidence that Adams stopped using his cell phone several days before Leger's murder and resumed using it at 11:13 a.m. on the date of her death;

4) evidence of Adams's prior threatening behavior and Leger's fear of him;

5)  and evidence that Adams purchased GPS trackers and used his work

computer to look up coordinates corresponding to Leger's home.

ROA.226. Explaining that "[t]hese facts are notably absent from Adams' statement

of the evidence presented at trial," the district court concluded that "a rational

factfinder could have found that Adams was guilty beyond a reasonable

doubt." ROA.227

For several reasons, the district court erred. First, the killing occurred the

morning of September 9 only if you assume that Adams was the murderer. The

record supports only that Leger was murdered "sometime between 8 a.m. and 4:30

p.m." *Adams*, 2018 WL 2355280, at *15. Because Adams had an alibi after 10:45

a.m., it was merely the police's theory that between one and three unidentified men

had sex with Leger in her home, and then Adams entered and murdered her, all

between 8:00 and 10:45 a.m. *Id.* at *4.

Second, Adams did address the firearm evidence. Again, that a gun collector

and firearms dealer once owned two .22 caliber firearms is entirely unremarkable.

ROA.12222. And the State's own firearms expert testified that the groove patterns

on the .22 bullets recovered at the crime scene matched the groove pattern for at

least seventeen other gun manufacturers' groove patterns. *Id.* at *10. Adams's

fingerprints were not identified on the recovered shell casings. ROA.12562. And

the police confiscated Adams's firearms when a judge entered a protective order following the sexual assault and kidnapping allegations. ROA.12275-77.

Third, the court ignored that Adams's "cell phone records showed that this usage pattern was not unusual for him." *Adams*, 2018 WL 2355280, at *23 (Whitehill, J., dissenting). "Specifically, for the time period beginning April 1, 2013, when the records began, through September 9, 2013, when the murder happened, there were either no phone calls made or there were no calls made before 11:00 a.m. on 72 out of those 162 days (or 44% of those days)." *Id.* At most, then, the cell phone records only further show that Adams had a small window of opportunity to murder Leger.

Fourth, Leger's claim that Adams threatened to kill her if she testified in the sexual assault case and tried to intimidate her by leaving a tarp and handcuffs on her porch show only Adams's motive and that he knew where she lived—again, that he had the opportunity to murder her. Moreover, this evidence, like much of the evidence presented by the State, is suspect. Leger never reported the supposed tarp and handcuffs incident to the police, including to Detective Greer, with whom she was involved in an inappropriate relationship. ROA.13100.

Finally, and relatedly, that Adams purchased GPS trackers (ROA.4839) and searched coordinates that corresponded to Leger's home (ROA.4974) showed only that he knew where she lived, not that he had ever been to her house.

Again, then, the evidence showed only that (1) Adams had a motive; (2) he had a small window of opportunity; (3) the police found an ordinary machine screw in his truck that could have come from anything, including a gun grip; and (4) a single instance of his touch DNA was identified on a condom in Leger's bathroom trash can. ROA.12977. The evidence therefore is legally insufficient to support Adams's capital murder conviction, and in concluding otherwise, Texas's Fifth Court of Appeals unreasonably applied *Jackson v. Virginia*, 443 U.S. 307 (1979). *See* 28 U.S.C. § 2254(d)(1).

## Conclusion

This Court should reverse the district court's judgment and remand this case to that Court to order Adams's unconditional release with prejudice to re-prosecution. *See Tanner v. Yukins*, 867 F.3d 661, 674 (6th Cir. 2017) (reversing the judgment of the district court and remanding the case with directions to set aside conviction and free petitioner "unconditionally from state supervision" where state court unreasonably applied *Jackson v. Virginia*); *see also O'Laughlin v. O'Brien*, 568 F.3d 287, 309 (1st Cir. 2009); *Rayner*, 2023 WL 1433610, at *2.

Respectfully submitted,

/s/ Brett Ordiway
BRETT ORDIWAY
Texas Bar No. 24079086
brett@ordiway.com

ROBERT UDASHEN
Texas Bar No. 20369600
robert@ordiway.com

ORDIWAY PLLC
8350 N. Central Expressway
Suite 1900
Dallas, Texas 75206
(469) 205-1600

*Counsel for Petitioner-Appellant*

## CERTIFICATE OF SERVICE

On November 18, 2025, I filed this brief via the Court's ECF system and served a copy to Respondent's counsel.

/s/ Brett Ordiway
BRETT ORDIWAY

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the brief exempted

by Fed. R. App. P. 32(f), it contains 5,048 words. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14-point Equity, a proportionally spaced typeface, using Microsoft Word, the same program used to calculate the word count.

/s/ Brett Ordiway
BRETT ORDIWAY